**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| GlobalTranz Enterprises Incorporated, | No. CV-18-04819-PHX-ROS |
| Plaintiff, | **ORDER** |
| v. | |
| Sean Michael Murphy, et al., | |
| Defendants. | |

Pending before the Court are two motions for summary judgment, one from Plaintiff GlobalTranz Enterprises ("GTZ") and one from Defendant Sean Michael Murphy ("Murphy"). Murphy is a former employee of GTZ. GTZ alleges when Murphy left GTZ, he stole one of GTZ's clients, confidential information, and trade secrets. As a result, GTZ sued Murphy for breach of contract, breach of fiduciary duty, misappropriation of trade secrets under federal and Arizona law, tortious interference, conversion, breach of duty of good faith and fair dealing, unjust enrichment, and civil conspiracy. Murphy has counterclaimed overtime wage violations under federal and Arizona law. Both GTZ and Murphy seek summary judgment on GTZ's breach of contract, breach of fiduciary duty, Arizona trade secrets claim, and Murphy's FLSA claim. Only Murphy seeks summary judgment on GTZ's federal trade secrets claim and the remaining tort claims. No one seeks summary judgment on the Arizona wage and overtime claim. As will be discussed below, GTZ's motion for summary judgment will be denied and Murphy's motion for summary judgment will be granted in part and denied in part.

**BACKGROUND**

The most basic of background facts are heavily disputed. The Court will provide an overview without resolving the disputes.

GTZ is a freight broker and third-party logistics company specializing in freight management services.[1] (Docs. 1-3 at 24; 126 at 2). According to GTZ's website, it "provides shippers of all sizes with fast and reliable transportation services across all major modes of freight." About GlobalTranz, https://www.globaltranz.com/company/ (last visited March 23, 2021). Broadly speaking, GTZ is a broker that connects shippers (e.g., retailers) with carriers or freight providers (e.g., truck companies).

On February 19, 2014, Murphy signed an employment offer from GTZ. (Doc. 126 at 2). The employment offer required Murphy to sign GTZ's "standard non-compete agreement . . . prior to or on [his] start date." (Doc. 126 at 2). He began work as a Junior Carrier Relations Representative on March 3, 2014. (Doc. 126-1).

According to GTZ, Murphy electronically agreed to GTZ's "Employee Proprietary Information, Inventions, and Non-Solicitation Agreement" (hereafter "Restrictive Covenants Agreement") on his first day at work. That agreement contains nondisclosure and anti-piracy restrictive covenants. (Doc. 126-5). Murphy claims to have no memory of entering into the agreement.

In early 2015, Murphy began working as a Logistics Specialist and was promoted to a Senior Logistics Specialist in January or February 2017.[2] (Docs. 126 at 4; 139 at 2). In both roles, Murphy secured new business for GTZ and managed existing customer

---

[1] To highlight the extent to which the facts are disputed, the parties dispute characterizations of the "freight industry" and "role of third-party logistics providers." (Doc. 137 at 2). In general, the parties have lost sight that the focus in summary judgment motions is on *material* factual disputes in order to resolve the motions, not just any factual disputes they might have, including immaterial disputes. *See, e.g.*, *Momox-Caselis v. Donohue*, 987 F.3d 835, 841 (9th Cir. 2021) (noting summary judgment practice depends on material factual disputes).

[2] The parties use inconsistent terms and dates for Murphy's roles at GTZ. Beginning in early 2015, Murphy's role was either a Logistics Specialist or Senior Logistics Specialist. Beginning in early 2017, he was either promoted to a Senior Logistics Specialist, Lead Logistics Specialist, or Lead Senior Logistics Specialist. (*See e.g.*, Docs. 126-2 at 6; 126-13 at 20; 128-2 at 3). For simplicity's sake, the Court will use Logistics Specialist and Senior Logistics Specialist.

accounts. (Doc. 126 at 3).

One of those accounts was KIK International ("KIK"). (Doc. 126 at 4). According to Murphy, he first learned of KIK "on the back of a box at Home Depot" in 2015. (Doc. 126-18 at 37). He then called KIK and asked about their shipping needs. (Doc. 126-18 at 37). Murphy secured KIK as a client for GTZ. (Doc. 126-18 at 38). In 2015, KIK generated for GTZ about $229,087.47 in revenue and $53,543.71 in profits.[3] (Docs. 126 at 5, 115 at 6). In 2016, KIK generated GTZ about $522,237.29 in revenue and $93,084.25 in profit. (Docs. 126 at 5; 116 at 9). In 2017, KIK generated GTZ about $2,194,953.62 in revenue and $297,989.38 in profit. (Docs. 126 at 5; 119 at 10).

In the four months before Murphy resigned on February 5, 2018, GTZ claims Murphy "systemically prepared to take KIK from GTZ." (Doc. 126 at 3, 5). On October 27, 2017, Murphy emailed to his personal email two GTZ spreadsheets containing KIK information. (Doc. 126 at 5–6).[4] Those spreadsheets included GTZ data on prior shipments and historical averages among other data used to formulate a bid. (*See*, *e.g.*, Doc. 120). On November 17, 2017, Murphy emailed to his personal email a PDF used to compile data and analyze potential rates to submit to a customer as a bid. (Doc. 126 at 6). This document contained 30 pages of KIK shipment information. On January 25, 2018, Murphy emailed to his personal email correspondence between Murphy and other GTZ employees regarding the KIK bid process, strategies, and bid prices. (Doc. 126 at 6). That correspondence included a discussion about a specific bid and how GTZ might handle competitors' bids for KIK. (Doc. 113-1). Minutes later, he sent an email to his personal email containing an exchange between Murphy and a manager at GTZ regarding KIK's shipping volume in California and its strategic importance to GTZ. (Doc. 126 at 6). Minutes after that, he emailed to his personal account a document that identified the costs and methods of charging that KIK preferred. (Doc. 126 at 6).

---

[3] Murphy objects to the revenue and profit figures put forth by GTZ as solely relying on Murphy's deposition testimony. (Doc. 139 at 3). But whether these figures are accurate is not material. The parties agree GTZ and KIK had a substantial business relationship from 2015 through 2017.

[4] GTZ asserts the spreadsheets contained confidential information, while Murphy contends they do not.

Later on the afternoon of January 25, Murphy sent a LinkedIn message to Armstrong Transport Group LLC ("Armstrong"), a GTZ competitor, inquiring about becoming an agent for Armstrong. (Doc. 126 at 7). Lauren Russell, a recruiter at Armstrong, responded on January 31, 2018 explaining Armstrong's outside agent-based model. (Doc. 126 at 7). Russell explained, Armstrong wanted to "give agents another option besides GTZ." (Doc. 126 at 7). Russell then offered and provided a live demonstration of Armstrong's shipping software. (Doc. 126 at 7). On February 1, 2018, Murphy provided Russell with what he claimed were his finalized 2017 financial performance figures (e.g., revenue, margin, number of shipments). (Docs. 126 at 7; 114-3 at 5). Russell then asked Murphy, "Do you want me to vet any of your large customers (top 10) to see if there is any customer clearance issues," meaning was another agent at Armstrong already working with Murphy's large clients? (Docs. 114-3 at 4; 126-28 at 6). Murphy replied with twelve GTZ customers for whom Murphy provided account management services. (Doc. 126 at 7). The parties dispute whether Russell knew Murphy worked for GTZ and that the customers were GTZ's rather than Murphy's. (Docs. 126 at 7; 139 at 5). The parties also dispute whether Murphy attempted to hide these facts from Russell. (Docs. 126 at 7; 139 at 5).

On February 5, 2018, Murphy resigned from GTZ (Doc. 126 at 7). The next day, GTZ sent a certified letter advising Murphy of his continuing obligations to GTZ as set forth in the Restrictive Covenants Agreement. (Doc. 126 at 8). On January 18, 2018, prior to resigning from GTZ, Murphy formed his own company, DirectPoint Logistics, LLC. (Doc. 1-3 at 28). It appears Murphy used DirectPoint as an intermediary to become an "Independent Contractor Freight Agent" for Armstrong on February 23, 2018. (Docs. 126 at 8, 139-2 at 10). Within days of signing with Armstrong, Murphy submitted a request for Armstrong to grant KIK a line of credit. (Doc. 126 at 8). On March 29, 2018, KIK's credit application was approved by Armstrong. (Doc. 126 at 8). Murphy, presumably through his company DirectPoint, then provided KIK services from April or May of 2018 until November or December of 2018. (Doc. 126 at 8).

On November 16, 2018, GTZ filed this action in Maricopa County Superior Court against Murphy, his wife (listed as "Jane Doe Murphy"), DirectPoint, and Armstrong.[5] (Doc. 1-3 at 22). The complaint alleges ten counts. Against Murphy, GTZ alleges breach of contract, breach of fiduciary duty, and breach of the duty of good faith and fair dealing. Against Armstrong and DirectPoint, GTZ alleges aiding and abetting a breach of fiduciary duty. Against all defendants, GTZ alleges misappropriation of trade secrets in violation of the federal Defend Trade Secrets Act and the Arizona Uniform Trade Secrets Act, tortious interference with contracts/business expectancies, conversion, unjust enrichment, and civil conspiracy. (Doc. 1-3 at 34–45).

Murphy asserted counterclaims for a violation of the federal Fair Labor Standards Act ("FLSA") and Arizona state law for unpaid wages and overtime. (Doc. 130 at 15–16). On December 19, 2018, Armstrong removed this action to federal court under federal question jurisdiction and supplemental jurisdiction. (Doc. 1). On November 12, 2019, GTZ and Armstrong stipulated to dismiss Armstrong and it was granted. (Docs. 55, 56).

GTZ and Murphy now bring motions for summary judgment.[6] Both GTZ and Murphy seek summary judgment on GTZ's breach of contract, breach of fiduciary duty, Arizona trade secrets claim, and Murphy's FLSA claim. Only Murphy seeks summary judgment on GTZ's federal trade secrets claim and the remaining tort claims. No one seeks summary judgment on the Arizona wage and overtime claim.

## LEGAL STANDARD

"[W]hen simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132,

---

[5] Presumably, Jane Doe Murphy was identified as a party to comply with Arizona's community property rules, but she never appeared, and it is unclear who she is.

[6] Murphy's motion is not specifically brought on behalf of DirectPoint but seeks summary judgment on the aiding and abetting tort alleged against only DirectPoint. (Doc. 128 at 1). Murphy and DirectPoint are both represented by the same attorney and Murphy argues he and DirectPoint are one and the same. While confusing and because it is uncontested, the Court will treat Murphy's motion as if it was filed on behalf of both Murphy and DirectPoint.

1134 (9th Cir. 2001). The moving party is entitled to summary judgment if the evidence, viewed in the light most favorable to the non-moving party, shows "there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004); *Margolis v. Ryan*, 140 F.3d 850, 852 (9th Cir. 1998). At summary judgment, the court cannot weigh the evidence nor make credibility determinations. *Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1035 (9th Cir. 2005). However, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . , the court may . . . consider the fact undisputed." Fed. R. Civ. P. 56(e)(2). The moving party initially bears the burden of proving the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 321–25 (1986). To do so, "[t]he moving party must either produce evidence negating an essential element of the non-moving party's claim or defense or show that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). The burden then shifts to the non-moving party to demonstrate the existence of a factual dispute that might affect the outcome of the suit. *Saddiq v. Trinity Servs. Grp.*, 198 F. Supp. 3d 1051, 1055 (D. Ariz. 2016). Non-movants "must show a genuine issue of material fact by presenting *affirmative evidence* from which a jury could find in his favor." *F.T.C. v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009) (emphasis in original) (citing *Anderson v. Liberty Lobby*, 447 U.S. 242, 257 (1986)). "A non-movant's bald assertions or a mere scintilla of evidence in his favor are both insufficient to withstand summary judgment." *Id.* (citing *Galen v. Cty. of Los Angeles*, 477 F.3d 652, 658 (9th Cir. 2007)).

Regarding the evidence, the district court "need consider only the cited materials." Fed. R. Civ. P 56(c)(3). Thus, "where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found" "[t]he district court need not examine the entire file for evidence establishing a genuine issue of fact." *Wyatt Tech. Corp. v. Smithson*, 345 F. App'x 236, 239 (9th Cir. 2009) (quoting *Carmen v. San Fran.*

1   *Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001)). That said, the district court may

2   consider materials in the record not cited by the parties, as long as it is admissible evidence.

3   Fed. R. Civ. P 56(c)(3).

### ANALYSIS

### I. Breach of Contract

6   The parties have filed cross-motions regarding aspects of GTZ's breach of contract

7   claim. Both parties seek summary judgment on the validity of the contract, the

8   reasonableness of the restrictive covenants, whether Murphy materially breached, and

9   whether the alleged breach damaged GTZ. The Court will assume, without deciding, the

10  agreement is valid for the purpose of addressing the reasonableness of the restrictive

11  covenants.[7] Because the restrictive covenants are unreasonable, the Court will grant

12  Murphy's motion for summary judgment.

### A. Restrictive Covenants

14  Both parties seek summary judgment on the Restrictive Covenants Agreement's

15  restrictive covenants. GTZ argues the covenants are reasonable while Murphy argues they

16  are not. (Docs. 126 at 10; 128 at 4).

17  Whether a restrictive covenant is reasonable is a question of law. *Valley Med.*

18  *Specialists v. Farber*, 194 Ariz. 363, 366 (1999). Restrictive covenants are unreasonable

19  "if (a) the restraint is greater than is needed to protect the [employer's] legitimate interest,

20  or (b) the [employer's] need is outweighed by the hardship to the [former employee] and

21  the likely injury to the public." *Fearnow v. Ridenour, Swenson, Cleere & Evans, P.C.*, 213

---

[7] The Court notes the insufficiency of GTZ's evidence to support valid contract formation. GTZ only puts forth an electronic record of acknowledgement, unattached to the agreement, that lists Murphy's name, user ID, and the date acknowledged. (Doc. 126-5 at 1). To support its assertion that employees "checked the lower left corner of the screen to acknowledge viewing and agreeing to the terms of the specific document," GTZ only provides its self-serving answers to Murphy's interrogatory. (Doc. 126-2 at 4–5). GTZ does not provide the language from the acknowledgment indicating Murphy was agreeing to a contract nor does GTZ provide a declaration from a knowledgeable person regarding how the system worked. Citing merely to their conclusory answers to Murphy's interrogatories is insufficient as, "[n]ormally, a party may not introduce [as evidence] his self-serving answers to an opponent's interrogatories." *Grace & Co. v. City of Los Angeles*, 278 F.2d 771, 776 (9th Cir. 1960). GTZ has not explained how the information in its interrogatory answers could be established as admissible for trial.

Ariz. 24, 26 (2006) (citation and internal quotation marks omitted). "The determination of reasonableness is a fact-intensive inquiry that depends on the totality of the circumstances." *Id.* (citation and internal quotation marks omitted).

Most restrictive covenant cases involve a non-compete agreement, where an employee is prohibited from competing with the former employer within a geographic area for a limited period of time. *Id.* (citation omitted). "Restrictive covenants that tend to prevent an employee from pursuing a similar vocation after termination of employment are disfavored and are strictly construed against the employer." *Bryceland v. Northey*, 160 Ariz. 213, 216 (Ct. App. 1989). Here, there are two covenants at issue, neither of which is labeled a "non-compete agreement" but, in Murphy's view, both covenants are unreasonable restraints on his behavior.

Three Arizona cases are instructive. First, the court in *Amex Distributing Company v. Mascari* considered a confidentiality agreement. 150 Ariz. 510 (Ct. App. 1986). It read:

> Employee acknowledges that by reason of this position and employment with Employer that Employee will be entrusted with information relating to the customers of the Employer, as well as to Employer's means and methods of handling and servicing the business and affairs of said customers. Employee agrees with Employer that at all times during this employment with Employer, and at all times after termination of employment with Employer, if such termination occurs, that Employee shall, consistent with duties to Employer's customers, and duties to the Employer, keep and maintain this information confidential and shall not utilize any of said information to compete against the Employer, either directly or indirectly.

*Id.* at 513. When the former employer sued the former employee, the court held trade secrets are entitled to infinite protection, but "the same is not true of customer information, especially in a field where customers are known and generally accessible to competitors." *Id.* at 517. Rather than a protection of trade secrets, the court held the confidentiality covenant essentially amounted to "a noncompetition covenant, which [was] wholly without temporal limitation." *Id.* As "absent a special and enforceable duty, an alert salesperson is not required to undergo a prefrontal lobotomy," the court held the covenant invalid. *Id.* (citations omitted).

- 8 -

Similarly, the court in *McKesson Medical-Surgical v. Caccavale*, applying Arizona law, held a confidentiality covenant that applied "to any information about any customer or potential customer, pricing, or products, without any limitation" swept "so broadly that it [was] unreasonable and amount[ed] to a covenant not to compete without any geographical or temporal limitation." No. CV-04-1351-PHX-SRB, 2008 WL 11338486, at *6 (D. Ariz. Dec. 23, 2008).

Finally, in *Orca Communications Unlimited v. Noder*, the court ruled a confidentiality covenant unenforceable because it prohibited the former employee from using public information and any information learned during her employment with Orca. 233 Ariz. 411, 417 (Ct. App. 2013), *decision aff'd and ordered depublished in part*, 236 Ariz. 180 (2014). The court first held an employer cannot prohibit the use of public information.[8] *Id.* Then, the court held, "its prohibition of [the former employee's] use of any information she may have learned from her employment . . . is nothing more than an unlimited restriction against competing." *Orca*, 233 Ariz. at 417. The *Orca* agreement had a step-down provision that truncated the covenant to one year if a court required a temporal restriction to find the covenant reasonable. But because the covenant still had no geographic limitation, the agreement "prohibit[ed] her from working anywhere in [her] industry for twelve months." *Id.* The court reasoned the former employer "would be unable to show any facts that would outweigh this hardship" and ruled the covenant unenforceable "as the equivalent of a geographically unrestricted non-competition agreement." *Id.*

In sum, courts have repeatedly held overbroad confidentiality or nondisclosure covenants amount to non-compete covenants and are thus unreasonable and unenforceable.

### i. Nondisclosure

Murphy first challenges the nondisclosure covenant in the Restrictive Covenants Agreement. (Doc. 128 at 5). Murphy argues the nondisclosure agreement is unreasonable because it is so broad that it amounts to a non-compete agreement with no geographic limitation. (Doc. 128 at 6). The nondisclosure agreement states, "At all times during my

---

[8] The Restrictive Covenants Agreement did not prohibit the use of public information. (Doc. 126-5 at 2).

employment and thereafter, I will hold in strictest confidence and will not disclose, use, lecture upon or publish any of the Company's Proprietary Information." (Doc. 126-5 at 2). Proprietary Information is defined as:

> any and all confidential and/or proprietary knowledge, data or information of the Company, its affiliates, parents and subsidiaries, whether having existed, now existing, or to be developed during my employment. By way of illustration but not limitation, "**Proprietary Information**" includes
>
> (a) trade secrets, inventions, mask works, ideas, processes, formulas, source and object codes, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs and techniques and any other proprietary technology and all Proprietary Rights therein (hereinafter collectively referred to as "Inventions");
>
> (b) information regarding research, development, new products, marketing and selling, business plans, budgets and unpublished financial statements, licenses, prices and costs, margins, discounts, credit terms, pricing and billing policies, quoting procedures, methods of obtaining business, forecasts, future plans and potential strategies, financial projections and business strategies, operational plans, financing and capital-raising plans, activities and agreements, internal services and operational manuals, methods of conducting Company business, suppliers and supplier information, and purchasing;
>
> (c) information regarding customers and potential customers of the Company, including customer lists, names, representatives, their needs or desires with respect to the types of products or services offered by the Company, proposals, bids, contracts and their contents and parties, the type and quantity of products and services provided or sought to be provided to customers and potential customers of the Company and other non-public information relating to customers and potential customers;
>
> (d) information regarding any of the Company's business partners and their services, including names: representatives, proposals, bids, contracts and their contents and parties, the type and quantity of products and services received by the Company, and other non-public information relating to business partners;
>
> (e) information regarding personnel, employee lists, compensation, and employee skills; and
>
> (f) any other non-public information which a competitor of the Company could use to the competitive disadvantage of the Company. Notwithstanding the foregoing, it is understood that, at all such times, I am free to use information which is generally known in the trade or industry through no breach of this agreement or other act or omission by me, and I am free to discuss the terms and conditions of my employment with

others to the extent permitted by law.

(Doc. 126-5 at 2).

The list of prohibited information is so extensive, the only information used or acquired during Murphy's employment not deemed confidential is information that is already public knowledge. GTZ even prohibits use of "any other non-public information which a competitor of the Company could use to the competitive disadvantage of the Company." Of course, *any* information a competitor might find useful would be to the disadvantage of GTZ. The nondisclosure covenant essentially seeks to neuter all of Murphy's experience, knowledge, and skills acquired at GTZ to the point that it would be impossible for him to work in the third-party logistics industry again. The nondisclosure agreement is thus overbroad in scope.

The agreement does contain a step-down provision allowing a court to limit nondisclosure to a two-year period if otherwise deemed unreasonable for lack of temporal limitation. (Doc. 126-5 at 3). However, a two-year non-compete covenant is still unreasonable, particularly because GTZ's covenant has no geographic limit. *See Orca*, 233 Ariz. at 417. As GTZ "would be unable to show any facts that would outweigh this hardship," the nondisclosure agreement will be found unreasonable and unenforceable in full. *See id.*

The agreement contains a severability clause allowing a provision to be severed from the remainder of the agreement if deemed unenforceable. (Doc. 126-5 at 7). Arizona recognizes the validity of such severability clauses. *See*, *e.g.*, *Valley Med. Specialists v. Farber*, 194 Ariz. 363, 371 (1999). As such, the nondisclosure covenant is severable from the remainder of the agreement and the Court must determine whether the other restrictive covenant is enforceable.

*ii. Non-Solicitation*

The same reasonableness analysis discussed above applies when a departing employee is "not entirely forbidden from competing." *Fearnow*, 213 Ariz. at 26 (citation omitted). For example, anti-piracy or hands-off agreements are "designed to prevent former

- 11 -

employees from using information learned during their employment to divert or to 'steal' customers from the former employer." *Olliver/Pilcher Ins. v. Daniels*, 148 Ariz. 530, 531 (1986). GTZ's non-solicitation covenant is essentially an anti-piracy agreement. Murphy challenges GTZ's non-solicitation covenant as overbroad and unreasonable. (Doc. 128 at 6).

GTZ's non-solicitation covenant does not allow Murphy, for one-year after his employment ended, to:

> solicit, induce or attempt to induce any Customer or Potential Customer, or any consultant or independent contractor with whom [he] had direct or indirect contact or whose identity [he] learned as a result of [his] employment with the Company, to terminate, diminish, or materially alter in a manner harmful to the Company its relationship with the Company; or . . . solicit, perform, provide or attempt to perform or provide any Conflicting Services for a Customer or Potential Customer.

(Doc. 126-5 at 5). Customer or Potential Customer is defined as:

> any person or entity who or which, at any time during the one (1) year prior to the date [his] employment with the Company ends,

> (i) contracted for, was billed for, or received from the Company any product, service or process with which [he] worked directly or indirectly during [his] employment by the Company or about which [he] acquired Proprietary Information; or

> (ii) was in contact with [him] or in contact with any other employee, owner, or agent of the Company, of which contact [he] was or should have been aware, concerning any product, service or process with which [he] worked directly or indirectly during [his] employment with the Company or about which [he] acquired Proprietary Information; or

> (iii) was solicited by the Company in an effort in which [he] was involved or of which [he] was or should have been aware.

(Doc. 126-5 at 5). Conflicting Services is defined as:

> any product, service, or process or the research and development thereof, of any person or organization other than the Company that directly competes with a product, service, or process, including the research and development thereof, of the Company with which [he] worked directly or indirectly during [his] employment by the Company or about which [he] acquired Proprietary Information during my employment by

the Company.

(Doc. 126-5 at 5). Essentially, GTZ's non-solicitation covenant prevents Murphy from working with any business or person GTZ was remotely involved with during the year prior to his termination. The covenant is limited to one-year and the Court will presume, without deciding, that this temporal limitation is reasonable. However, the covenant, as written, is still unreasonable.

The non-solicitation covenant is overbroad in scope. The covenant prohibits Murphy from working with customers or "potential customers" he never worked with or was unaware of but "should have been aware of." An example illustrates the unreasonableness. Assume GTZ sent a companywide email informing its employees it was targeting a potential (fictional) customer, known as Silver's Schnauzers, for business. Even if Murphy never opened the email and had never actually heard of Silver's Schnauzers before leaving GTZ, the covenant would prohibit him from working with Silver's Schnauzers because he "should have been aware of" GTZ's solicitation. Prohibiting former employees from working with all third parties who had even the slightest contact with GTZ appears to misunderstand the type of interest an employer can legitimately protect.

GTZ has a legitimate interest in preventing former employees from stealing customers or potential customers with whom the former employee formed a meaningful relationship during their employment. And GTZ's summary judgment motion actually acknowledges "a non-solicitation restriction may only protect against solicitation of those individuals with whom the defendants have formed a meaningful relationship." (Doc. 126 at 11 (citing *Olliver/Pilcher*, 148 Ariz. at 532)). GTZ's interest is not served by preventing Murphy from working with individuals or businesses he never had a meaningful relationship with at GTZ, even assuming Murphy somehow "should have known" GTZ was targeting those individuals or businesses. There is no unfairness in Murphy working with one of GTZ's customers or potential customers he had no knowledge of, or relationship with, during his time at GTZ. The hardship to Murphy, however, is great. Murphy would be prohibited from working with all of GTZ's customers and all "potential

- 13 -

1    customers." In fact, according to GTZ's website, that could total over 50,000 truckload
2    carriers and 25,000 clients. About GlobalTranz, https://www.globaltranz.com/company/
3    (last visited March 23, 2021). It is not clear how Murphy, acting in absolute good faith,
4    could navigate such terrain. There is nothing in the record to show Murphy was able to
5    discern who GTZ might classify as a "potential customer." Thus, this provision effectively
6    imposes a blanket non-compete. Moreover, it is a non-compete without any geographic
7    limitation. As such, the Court finds the non-solicitation covenant overbroad.

8                        *iii. Reformation Clause*

9          The Restrictive Covenants Agreement does contain a reformation clause but not one
10   sufficiently clear to save the two covenants. The contract states:

11             If moreover, any one or more of the provisions contained in
               this Agreement shall for any reason be held to be excessively
12             broad as to duration, geographical scope, activity or subject, it
               shall be construed by limiting and reducing it, so as to be
13             enforceable to the extent compatible with the applicable law as
               it shall then appear.
14

15   (Doc. 126-5 at 7).

16         In Arizona, courts follow the "blue pencil" rule. *Compass Bank v. Hartley*, 430 F.
17   Supp. 2d 973, 980 (D. Ariz. 2006). This allows courts to "eliminat[e] grammatically
18   severable, unreasonable provisions" of covenants. *Fearnow*, 213 Ariz. at 32.

19         In *Fearnow*, the Arizona Supreme Court blue-penciled an agreement, which
20   required all departing shareholders from a law firm to return their stock. *Id.* All but
21   shareholders choosing to compete with the law firm within a geographic region would
22   receive their original subscriptions as payment for the returned stock. *Id.* The court held
23   this restriction, targeting shareholders who chose to compete within a region, was
24   grammatically severable under the blue pencil rule. *Id.*

25         While Arizona allows courts to blue-pencil agreements, courts are not allowed to
26   "add terms or rewrite provisions" to covenants. *Id.* In *Farber*, the Arizona Supreme Court
27   addressed the enforceability of a non-compete clause prohibiting a departing physician
28   from practicing medicine within a five-mile radius of any of three specific clinic locations

for a period of three years. *Valley Medical Specialists v. Farber*, 194 Ariz. 363 (1999). The contract contained a reformation clause, like the one GTZ included, that allowed a court, if necessary, to amend the covenant to make it enforceable. *Id.* at 372 n.2. Despite the clause, the court held the covenant was unenforceable because both the scope and duration were unreasonable, and courts are not permitted "to add terms or rewrite provisions" of contracts. *Id.* at 372. The court explained that many contracts do not make their way to court, allowing employers to use overbroad restrictive covenants to instill fear in former employees. *Id.* All the while, the employer takes comfort in its reformation clause, assuming, if challenged, the covenant will be modified by the court to make it enforceable. *Id.*

Similarly, in *Varsity Gold*, the non-competition clause prohibited the employee from "competing with Varsity in 'the state of Pennsylvania or any contiguous state." *Varsity Gold v. Porzio*, 202 Ariz. 355, 356 (Ct. App. 2002). Like *Farber*, it also contained a reformation clause. The trial court found the non-competition provision unenforceable and amended the scope to the south Pittsburgh area for the duration of one year. The Court of Appeals disagreed, stating that any judicial reformation beyond implementation of the blue-pencil rule is a "significant modification of that provision that cannot be tolerated." *Id.* at 358–59.

Pursuant to Arizona's view of the blue-pencil rule, the Court cannot add terms or rewrite provisions and will not do so here. The parties failed to contemplate a geographic limitation to the covenants, which both amounted to non-compete agreements. Because the Court cannot add terms, neither covenant can be reformed.

Even setting aside the lack of geographic limits, to make the non-solicitation covenant reasonable, substantial modifications would be required. GTZ asks the Court to do just that by "blue pencil editing [out all] phrases that are inapplicable to the dispute at hand." (Doc. 150 at 12). In doing so, GTZ seeks to limit the restrictive covenant only to those customers Murphy directly worked with while at GTZ. (Doc. 150 at 12). GTZ argues Arizona's blue-pencil rule would allow for the following changes to the definition of

"Customer or Potential Customer":

> any person or entity who or which, at any time during the one (1) year prior to the date [his] employment with the Company ends,

> (i) contracted for, was billed for, or received from the Company any product, service or process with which [he] worked directly ~~or indirectly during [his] employment by the Company or about which [he] acquired Proprietary Information; or~~

> ~~(ii) was in contact with [him] or in contact with any other employee, owner, or agent of the Company, of which contact [he] was or should have been aware, concerning any product, service or process with which [he] worked directly or indirectly during [his] employment with the Company or about which [he] acquired Proprietary Information; or~~

> ~~(iii) was solicited by the Company in an effort in which [he] was involved or of which [he] was or should have been aware.~~

And GTZ proposes the agreement's provision regarding "Conflicting Services" be changed as follows:

> any product, service~~, or process or the research and development thereof, of any person or organization other than the Company~~ that directly competes with a product, service~~, or process, including the research and development thereof,~~ of the Company with which [he] worked directly ~~or indirectly during [his] employment by the Company or about which [he] acquired Proprietary Information during my employment by the Company.~~

This exercise requires modifications well beyond any plausible attempt to cut grammatically severable, unreasonable provisions. It amounts to an attempt to rewrite the agreement to make it enforceable. The Arizona Supreme Court has recognized and prohibited the fear caused to employees by overbroad restrictive covenants while employers take comfort in reformation clauses that courts may use to uphold only reasonable restrictions. No such comfort will be afforded here.

Because the restrictive covenants are unenforceable, Murphy's motion will be granted, and the restrictive covenants are unenforceable. Therefore, the breach of contract claim fails.

## II. Trade Secrets

Both parties seek summary judgment on Murphy's alleged misappropriation of GTZ's customer information under the Arizona Uniform Trade Secrets Act ("AUTSA"). Murphy also seeks summary judgment on GTZ's federal Defend Trade Secrets Act ("DTSA") claim. For both claims, GTZ alleges Murphy misappropriated GTZ's customer information, including information about KIK, by transferring the information to his personal email and providing it to Armstrong in an attempt to become an outside broker for Armstrong.[9] (Doc. 126 at 5). The Court will deny summary judgment to both parties because there are material disputes of fact as to whether the GTZ information at issue qualifies as a trade secret.

### A. Qualification as Trade Secrets

Under AUTSA and DTSA, the initial trade secrets inquiry is virtually identical. To establish misappropriation of a trade secret, the plaintiff must prove a legally protectable trade secret exists. *See Calisi v. Unified Fin. Servs.*, 232 Ariz. 103, 106 (Ct. App. 2013); *InteliClear v. ETC Glob. Holdings*, 978 F.3d 653, 657–58 (9th Cir. 2020) ("plaintiffs must identify the trade secrets and carry the burden of showing they exist") (internal quotations and citation omitted). First, a trade secret must be actually secret. *See id.* Then, the owner of the trade secret must have taken reasonable measures to maintain the secrecy of the information. 18 U.S.C.A. § 1839(3)(A); Ariz. Rev. Stat. § 44-401(4)(b). Finally, "the information [must] derive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C.A. § 1839(3)(B); Ariz. Rev. Stat. § 44-401(4)(a). Essentially,

---

[9] GTZ does not identify, with precision, the trade secrets at issue. In GTZ's motion for summary judgment, it only refers to its alleged trade secrets as "customer information and associated financials." (Doc. 126 at 19, 21). In its complaint, GTZ describes its alleged trade secrets as "confidential and proprietary information and information regarding the needs, requirements, specifications, processes, preferences, expectancies, characteristics, traits, habits and tastes of [GTZ's] customers, leads, referrals, and employees." (Doc. 1-3 at 39). Courts ordinarily require a party to identify trade secrets with sufficient particularity. *Smartcomm License Servs. v. Palmieri*, No. 1 CA-CV 16-0265, 2018 WL 326510, at *8 (Ariz. Ct. App. Jan. 9, 2018). At trial, GTZ must be prepared to explicitly identify the trade secrets or they will not be allowed.

1    whether a trade secret exists is a mixed question of law and fact that requires the
2    information be secret, reasonable measures were taken to maintain secrecy, and the
3    information has independent economic value derived from its secrecy. *Calisi*, 232 Ariz. at
4    106.

5         In support of its argument that GTZ's "customer information" is a trade secret, GTZ
6    primarily argues that customer lists are trade secrets in Arizona. (Doc. 126 at 20). The
7    argument, relying heavily on case law, is convincing but not dispositive here. *See*, *e.g.*,
8    *Calisi*, 232 Ariz. at 109. "While courts have held that customer lists may be considered
9    trade secrets, they do not per se qualify as such." *CleanFish v. Sims*, No. 19-CV-03663-
10   HSG, 2019 WL 2716293, at *3 (N.D. Cal. June 28, 2019) (citation omitted). Thus, while
11   customer lists *may* qualify as trade secrets, the inquiry is still context specific. *See Calisi*,
12   232 Ariz. At 107–108 (identifying factors for courts to use in assessing if customer lists
13   qualify as trade secrets). Here, neither party has established the absence of disputes of
14   material facts as to the secrecy, efforts to maintain secrecy, and economic value of GTZ's
15   customer information.

16        There are many material factual disputes concerning the secrecy and measures to
17   maintain secrecy of the information. GTZ claims the information in the spreadsheets
18   Murphy emailed to his personal account consists of "highly confidential and proprietary
19   data, . . . all of which gives GTZ a competitive advantage." (Doc. 113-1 at 3). GTZ cites
20   two measures to demonstrate secrecy and the measures GTZ takes to maintain secrecy.
21   First, GTZ utilizes the Restrictive Covenants Agreement discussed above to keep
22   information secret. (Doc. 126 at 21–22). Second, GTZ argues it provided outside agents
23   only limited access to customer information on its various software platforms. (Doc. 137
24   at 4). Murphy responds that GTZ's customer information does not qualify as trade secrets
25   because much of the information was provided by KIK, not GTZ. In addition, some of the
26   GTZ documents were prepared in part by KIK employees and KIK employees were not
27   required to sign confidentiality agreements. Murphy further attests that GTZ's bids, rates,
28   and pricing are regularly and frequently posted by GTZ employees on third party websites.

(Doc. 128 at 17).[10] And Murphy states GTZ allowed outside agents to access its software-based information with few limits and authorized former employees to operate as outside agents with access to GTZ software. (Doc. 128 at 18).

GTZ disputes the amount of access outside agents have to GTZ's customer information. (Doc. 137 at 4). GTZ claims outside agents were not permitted access to certain software for the first six months, have limited access based on their tenure and engagement with GTZ, and are never provided with customer financials. (Doc. 137 at 14). But based on the briefing and evidence the parties provided, it is not possible to draw absolute conclusions regarding the extent to which the information was actually kept secret and whether GTZ made sufficient efforts to keep the information secret.

Moreover, there are disputes of material fact as to the independent economic value of the information's secrecy. GTZ alleges the information's secrecy is valuable. (Doc. 113-1 at 2). GTZ argues that Murphy's "extreme steps to siphon [the KIK information] to his personal email account" demonstrates the inherent value and usefulness of the information. This fact is in dispute as Murphy denies that he forwarded the information to his personal email for its economic value. (Doc. 139 at 11). Instead, Murphy claims he sent the emails because he was actively working on matters related to the emails, and he denied having used the information after his resignation. (Doc. 139 at 11–12).[11] There is a dispute of material fact, in the nature of a credibility issue, as to the economic value of the secrecy of GTZ's customer information.

It is clear that factual disputes regarding secrecy, measures to maintain the secrecy, and the economic value of the secrecy remain. Those disputes are for the jury to decide. The Court will deny both sides' attempt at summary judgment on the AUTSA and DTSA claims.

---

[10] Murphy relies on both his own declaration about GTZ practices and screenshots of third-party websites displaying GTZ prices and customer information. (Doc. 128-2). GTZ challenges the admissibility of the screenshots but not Murphy's declaration. (Doc. 137 at 4). The Court will only rely on Murphy's declaration.

[11] GTZ also argues, "Murphy testified that he would have to protect the same type of information if it were created as part of his own business. (*See* Exh. 22)." (Doc. 126 at 22). The Court reviewed Exhibit 22 and did not find any such testimony. Thus, the Court will not address this allegation.

### III.    Tort Claims

Both parties seek summary judgment on GTZ's breach of fiduciary duty claim. Murphy also seeks summary judgment on all of GTZ's tort claims as allegedly preempted by AUTSA and on the merits. The motions on all tort claims will be denied.

#### A. Preemption

Murphy argues all of GTZ's common law tort claims are preempted by the AUTSA. (Doc. 128 at 19). AUTSA preempts common-law claims involving trade secrets. *Orca Commc'ns Unlimited v. Noder*, 236 Ariz. 180, 183 (2014). However, the "AUTSA does not displace common-law claims based on alleged misappropriation of confidential information that is not a trade secret." *Orca Commc'ns Unlimited v. Noder*, 236 Ariz. 180, 181 (2014). Because the Court cannot determine if any of GTZ's information is a trade secret based on the record provided, Murphy's preemption argument cannot be resolved on summary judgment.

#### B. Breach of Fiduciary Duty

Both parties seek summary judgment for breach of fiduciary duty. GTZ alleges Murphy breached the implied duty of loyalty as part of his fiduciary duty to GTZ. Murphy does not dispute he owed GTZ a duty of loyalty prior to his resignation, but he disagrees that there was any breach. (Doc. 139 at 13).

"Consistent with the fiduciary duty of loyalty, an employee may not, absent agreement to the contrary, statute or other authority, compete with his or her employer concerning the subject matter of the employment."[12] *Sec. Title Agency v. Pope*, 219 Ariz. 480, 492 (Ct. App. 2008) (citation omitted). "Nevertheless, an employee may make arrangements to compete." *Id.* (citation and internal quotations omitted). Thus, the question is whether Murphy's actions constituted "a breach of [his] fiduciary duty or were merely

---

[12] "When interpreting state law, federal courts are bound by decisions of the state's highest court. In the absence of such a decision, a federal court must predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance." *Strother v. S. California Permanente Med. Grp.*, 79 F.3d 859, 865 (9th Cir. 1996), *as amended on denial of reh'g* (Apr. 22, 1996), *as amended on denial of reh'g* (June 3, 1996) (citation and internal quotations omitted).

legally permissible preparations to compete." *Id.* (citation and internal quotations omitted).

"The line separating mere preparation from active competition may be difficult to discern in some cases." *Id.* (citation and internal quotations omitted). Arizona courts rely on the Second Restatement of Agency (1958) to explore this question. *Id.* Comment e to Restatement § 393 provides:

> After the termination of his agency, in the absence of a restrictive agreement, the agent can properly compete with his principal as to matters for which he has been employed. . . . Even before the termination of the agency, he is entitled to make arrangements to compete, except that he cannot properly use confidential information peculiar to his employer's business and acquired therein. Thus, before the end of his employment, he can properly purchase a rival business and upon termination of employment immediately compete. He is not, however, entitled to solicit customers for such rival business before the end of his employment nor can he properly do other similar acts in direct competition with the employer's business.

Essentially, agents can prepare to compete while still employed but cannot actually compete.

The Arizona Court of Appeals has held the same. For example, in *McCallister Co. v. Kastella*, the employer alleged the employee, while still employed, breached her duty of loyalty by improperly soliciting both her employer's clients and fellow employees. 170 Ariz. 455, 458 (Ct. App. 1992). The court upheld the trial court's grant of summary judgment in favor of the employee because the employer had "not presented a single specific instance of improper solicitation by" the employee during her employment. *Id.* at 459. Without evidence, a mere allegation of improper solicitation during employment does not amount to a breach of the duty of loyalty.

GTZ argues the Court should follow the New Jersey Supreme Court's ruling in *Lamorte Burns & Co. v. Walters*, which also relies on the Restatement. 167 N.J. 285 (2001). In that case, the court held that two former employees breached their duty of loyalty when they used specific, valuable, confidential, proprietary information obtained during their employment to solicit clients of their former employer after their employment. *Id.* at 301. The Restatement recognizes that: "an agent has a duty to the principal not to use . . . in competition with the principal or to his injury, trade secrets, written lists of names, or

- 21 -

1   other similar confidential matters given to him only for the principal's use or acquired by

2   the agent in violation of duty[, but t]he agent is entitled to use general information

3   concerning the method of business of the principal and the names of the customers retained

4   in his memory, if not acquired in violation of his duty as agent." Restatement (Second) of

5   Agency § 396(b) (1958).

6          In *Walters*, the former employees actively solicited the business away from their

7   former employer. *Id.* at 298. Here, GTZ alleges, like the employees in *Walters*, Murphy

8   "purloined" protected information while employed in order to solicit busines away from

9   GTZ. (Doc. 126 at 18–19). GTZ claims the information was "purloined" through Murphy's

10  emails which sent customer information to his personal account and a customer list to

11  Armstrong. (Doc. 126 at 18–19). GTZ argues it was Murphy's efforts "while still employed

12  by GTZ" that ultimately caused KIK to stop doing business with GTZ. (Doc. 126 at19).

13         Murphy denies these allegations. Rather, Murphy provides evidence that he did not

14  initiate contact with KIK after his employment nor did he solicit KIK during his

15  employment. (Doc. 73-1 at 10–11). According to Murphy's declaration, he was contacted

16  by Brian Cosler, KIK's Director of Transportation Services on February 20, 2018, over

17  two weeks after Murphy resigned from GTZ. (Doc. 128-1 at 7). Murphy informed Cosler

18  that he had resigned from GTZ, to which Murphy claims Cosler said, "What do I need to

19  do to get you back in the mix over here, we need your help. I don't have a relationship with

20  GTZ, I have a relationship with you." (Doc. 128-1 at 7). Murphy then allegedly expressed

21  concerns about his employment agreement and non-solicitation provisions, which Cosler

22  disregarded, explaining Cosler had solicited Murphy, not the other way around.[13] (Doc.

23  128-1 at 7).

24         GTZ's only evidence is Murphy's emails to his personal email account. GTZ has

25  ─────────────
    [13] Murphy puts forth an email exchange between him and Cosler on February 21 and 22,
26  2018. In it Murphy writes, "Thank you for reaching out. This email is to confirm that I did
    not do or say anything to initiate contact with you, and that I did not do or say anything
27  during my employment with Globaltranz to notify you that I was leaving the company or
    my intentions after leaving the company. If this is not accurate or correct in any way please
    let me know." (Doc. 73-1 at 11). In response, Cosler writes, "This is correct!" (Doc. 73-1
28  at 12). GTZ challenges this email as inadmissible because KIK could not locate the record
    and authenticate it. (Doc. 137-4). The Court will not rely on the email exchange.

not offered admissible, undisputed evidence that Murphy used or intended to use the information for the purpose of competing. Nor has GTZ demonstrated the confidential nature of the information. GTZ does not provide admissible evidence that Murphy solicited KIK. And the Court has found no case that holds a former employee violates the duty of loyalty by accepting the solicitation of their former employer's client. Accordingly, the Court finds disputes of material facts remain. Summary judgment on the claim will be denied for both parties.

### C. Intentional Interference

Murphy seeks summary judgment on GTZ's intentional interference claim. GTZ alleges Murphy intentionally interfered with its business expectancy with KIK. A prima facie case of intentional interference requires: (1) existence of a valid contractual relationship or business expectancy, (2) knowledge of the relationship or expectancy on the part of the interferor, (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, (4) resultant damage to the party whose relationship or expectancy has been disrupted, and (5) that the defendant acted improperly. *Wells Fargo Bank v. Arizona Laborers, Teamsters & Cement Masons Loc. No. 395 Pension Tr. Fund*, 201 Ariz. 474, 493 (2002), *as corrected* (Apr. 9, 2002); *Neonatology Assocs. v. Phoenix Perinatal Assocs.*, 216 Ariz. 185, 187 (Ct. App. 2007). Murphy argues GTZ did not have an exclusivity agreement with KIK, and thus there was no valid contractual relationship or business expectancy.

Arizona law is not clear as to what constitutes a "business expectancy." The parties provide no briefing or cases on the point. The Arizona Court of Appeals addressed this point in *Dube v. Likins*, 216 Ariz. 406, 414 (Ct. App. 2007). There, the court held a plaintiff must "identify the specific relationship with which the defendant interfered." *Id.* And "[a]s a general rule, an action for tortious interference with a business relationship requires a business relationship evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered." *Id.* (quoting *Ethan Allen v. Georgetown Manor*, 647 So.2d 812, 815 (Fla.1994)). A plaintiff

- 23 -

may have a valid "business expectancy" when there is "a colorable economic relationship between the plaintiff and a third party with the potential to develop into a full contractual relationship." *Id.* (quoting *Hawaii Med. Ass'n v. Hawaii Med. Serv. Ass'n*, 113 Hawai'i 77, 148 P.3d 1179, 1217–18 (2006)).

Murphy fails to establish that the lack of an exclusivity agreement necessarily means there was no colorable economic relationship with the potential to develop into a full contractual relationship between GTZ and KIK. As GTZ asserts, GTZ and KIK had an ongoing business relationship for nearly three years at the time Murphy joined Armstrong and started working with KIK again. (Doc. 137 at 16). Accordingly, Murphy has not, as a matter of law, met its burden to prove GTZ did not have a valid "business expectancy." Summary judgment will be denied on the point.

### D. Conversion

Murphy seeks summary judgment on GTZ's conversion claim. GTZ alleges Murphy is liable for conversion of GTZ's customer list, bids, and other documents with customer information. Conversion "is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." Restatement (Second) of Torts § 222A(1) (1965). "An action for conversion ordinarily lies only for personal property that is tangible, or to intangible property that is merged in, or identified with, some document." *Miller v. Hehlen*, 209 Ariz. 462, 472 (Ct. App. 2005) (citation and internal quotations omitted).

Murphy argues customer lists, bids, and documents with generic business information do not constitute chattel because they are not documents, like a stock certificate, merged with intangible property. (Doc. 128 at 21). The Court agrees. *See Miller v. Hehlen*, 209 Ariz. 462, 472 (Ct. App. 2005); *Scottsdale Ins. v. Deanna K. Cook*, No. CV-10-1661-PHX-FJM, 2010 WL 4942764, at *3 (D. Ariz. Nov. 24, 2010). For the purpose of conversion, the documents are not tangible property either. *See id.* Moreover, GTZ has not established with admissible evidence that documents emailed to one's personal account

constitute "intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it." Accordingly, the Court grants Murphy summary judgment on the claim.

### E.  Breach of Implied Covenant of Good Faith and Fair Dealing

Murphy seeks summary judgment on GTZ's claim for breach of implied covenant of good faith and fair dealing. Murphy simply argues summary judgment on this claim should be granted for the same reasons as on GTZ's claim for breach of contract, breach of fiduciary duty, and misappropriation of trade secrets. (Doc. 128 at 21). GTZ does not respond with any argument of its own. (Doc. 137 at 15). Because no meaningful argument has been put forth that summary judgment should be granted on this claim, the Court will deny summary judgment. *See Tombstone, City of v. United States*, No. CV-11-00845-TUC-FRZ, 2015 WL 11120851, at *20 (D. Ariz. Mar. 12, 2015) (the argument "is so severely underdeveloped that the Court will not consider it.") (citing *Indep. Towers of Washington v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) (refusing to address issues not accompanied by legal argument and holding, "[w]hen reading ITOW's brief, one wonders if ITOW, in its own version of the 'spaghetti approach,' has heaved the entire contents of a pot against the wall in hopes that something would stick. We decline, however, to sort through the noodles in search of ITWO's claim.")).

### F.  Unjust Enrichment

Murphy seeks summary judgment on GTZ's unjust enrichment claim. GTZ alleges Murphy received the benefit of access to proprietary customer information, purchased sales leads, and existing customer goodwill. (Doc. 137 at 16). GTZ also alleges he retained these benefits by keeping GTZ proprietary information after his resignation. (Doc. 137 at 16). To recovery under a theory of unjust enrichment, "a plaintiff must demonstrate that the defendant received a benefit, that by receipt of that benefit the defendant was unjustly enriched at the plaintiff's expense, and that the circumstances were such that in good conscience the defendant should provide compensation." *Freeman v. Sorchych*, 226 Ariz. 242, 251 (Ct. App. 2011).

Murphy fails to argue why summary judgment should be granted. He lists the benefits GTZ alleges and states, other than those benefits, "GTZ has provided no other evidence of Murphy's alleged misappropriation or misconduct, nor any other benefit Murphy accrued at GTZ's expense." (Doc. 128 at 22). Murphy offers no argument why the benefits he admits GTZ alleges are insufficient for an unjust enrichment claim. Because Murphy has failed, the Court will deny the motion on this claim.

### G. Aiding and Abetting a Breach of Fiduciary Duty

Murphy seeks summary judgment on the aiding and abetting a breach of fiduciary duty claim against DirectPoint.[14] Aiding and abetting's elements are: "(1) the primary tortfeasor must commit a tort causing injury to the plaintiff; (2) the defendant must know the primary tortfeasor's conduct constitutes a breach of duty; and (3) the defendant must substantially assist or encourage the primary tortfeasor in achieving the breach." *Cal X-Tra v. W.V.S.V. Holdings*, 229 Ariz. 377, 406 (Ct. App. 2012). Murphy argues Murphy and DirectPoint are essentially one and the same because DirectPoint's only owner and employee is Murphy. (Doc. 128 at 22). Thus, Murphy argues DirectPoint cannot be liable for aiding and abetting Murphy. However, persons and limited liability companies are distinct, primarily for purposes of liability. *Dietel v. Day*, 16 Ariz. App. 206, 208 (1972). The parties fail to address how they apportion acts or liability between Murphy and DirectPoint but at the same time do not argue for alter ego liability, where a court would pierce DirectPoint's veil to reach Murphy for the purposes of liability. There are simply insufficient material, undisputed facts to grant summary judgment, so the motion will be denied on this issue.

### H. Civil Conspiracy

Murphy seeks summary judgment on the civil conspiracy claim. GTZ alleges Murphy, DirectPoint, and Armstrong all conspired to commit the other claims listed in the Complaint. (Doc. 1-3 at 44). Murphy argues Murphy's email communications do not show

---

[14] As discussed in footnote 6, DirectPoint does not move for summary judgment even though it is the only Defendant remaining on this claim. Because Murphy and DirectPoint are, for present purposes, virtually one and the same, the Court will treat the motion as if DirectPoint submitted it.

1    "an actual agreement, proven by clear and convincing evidence" as required by law. (Doc.

2    128 at 23). GTZ counters that Murphy's conduct and other circumstances prior to and

3    following his resignation provide sufficient evidence to meet its burden. (Doc. 137 at 16).

4    Whether GTZ's evidence of civil conspiracy is clear and convincing is a fact question best

5    left to the jury. As such, Murphy's motion will be denied on this issue.

6    **IV. FLSA Overtime Claim**

7         Both parties move for summary judgment on Murphy's Fair Labor Standards Act

8    ("FLSA") overtime claim. Murphy alleges when he was a Logistics Specialist from

9    December 2015 to December 2016, he was misclassified as an exempt employee and

10   regularly worked more than 40 hours per week, entitling him to overtime which was not

11   given. Murphy further alleges GTZ's conduct was willful, which would expand the usual

12   two-year statute of limitations to three-years. GTZ's conduct qualified as willful such that

13   Murphy's claim is timely. And there are no disputes of material fact that Murphy was not

14   properly classified nor are there disputes of material fact regarding GTZ's liability.

15   However, the precise amount of that liability must be proven at trial.

16   **A. Willfulness and Statute of Limitations**

17        Murphy alleges GTZ's FLSA violation was willful. "Ordinarily, a two-year statute

18   of limitations applies to claims under the FLSA." *Scalia v. Emp. Sols. Staffing Grp.*, 951

19   F.3d 1097, 1102 (9th Cir. 2020), *cert. denied sub nom. Emp. Sols. v. Scalia*, No. 20-660,

20   2021 WL 666405 (U.S. Feb. 22, 2021) (citing 29 U.S.C. § 255(a)). "But for a 'willful

21   violation,' the limitations period extends to three years." *Id.* (citing 29 U.S.C. § 255(a)).

22   Because Murphy's counterclaims were filed two years after the last alleged violation, GTZ

23   must have acted willfully for this action to be timely.

24        Willful behavior does not require an employer to knowingly violate the FLSA. *Id.*

25   (citation omitted). Rather, an employer acts willfully when it disregards "the very

26   possibility that it was violating the statute." *Id.* (citation and internal quotations omitted).

27   GTZ admits "by May 2015, it was aware of allegations related to federal overtime laws."

28   (Doc. 128-1 at 119). GTZ provides no evidence that it inquired into or attempted to comply

with the FLSA here. Because GTZ had notice of possible FLSA violations before December 2015 and provides no evidence that it attempted to comply with the statute, GTZ's violation was willful.

## B. Classification

The FLSA requires employers pay employees overtime wages of one and one-half times their regular rate of pay for each hour worked more than 40 hours during a week, unless the employees qualify for an exemption. 29 U.S.C. § 207(a)(1), 213(a)(1). Employees "employed in a bona fide executive, administrative, or professional capacity" may qualify for such an exemption. 29 U.S.C. § 213(a)(1). GTZ argues Murphy was administratively exempt. (Doc. 126 at 24). An administratively exempt employee "must (1) be compensated not less than $455 per week; (2) perform as her primary duty 'office or non-manual work related to the management or general business operations of the employer or the employer's customers;' and (3) have as her primary duty 'the exercise of discretion and independent judgment with respect to matters of significance.'" *McKeen-Chaplin v. Provident Sav. Bank, FSB*, 862 F.3d 847, 851 (9th Cir. 2017) (citing 29 C.F.R. § 541.200(a)). "These three conditions are explicit prerequisites to exemption, not merely suggested guidelines." *Id.* (citation and internal quotations omitted).

It is undisputed the salary requirement was satisfied. (*See* Doc. 126 at 24). Murphy was compensated more than $455 per week between December 2015 and December 2016.

The parties dispute whether Murphy's work satisfies the "primary duty" test. This test requires an employee "perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." *McKeen-Chaplin*, 862 F.3d at 861 (quoting 29 C.F.R. § 541.201(a)). The Ninth Circuit refers to this framework as the "administrative-production dichotomy." *Id.* "Its purpose is to distinguish between work related to the goods and services which constitute the business' marketplace offerings and work which contributes to running the business itself." *Id.* (citation and internal quotations omitted). In other words, the primary duty test "is met if the employee

engages in running the business itself or determining its overall course or policies, not just in the day-to-day carrying out of the business' affairs." *Id.* (citation and internal quotations omitted). For example, in a business that makes bobbleheads of baseball players, the individuals who physically make the bobbleheads fall likely would fall on the production side and not meet the primary duty test. Whereas the individuals who decide the quantity and players featured likely would fall on the administrative side and meet the test. "But the dichotomy is only determinative if the work falls squarely on the production side of the line." *Id.* (citation and internal quotations omitted). "[T]his means the analysis can be complicated." *Id.*

When an employee's primary role is sales, the employee's work is production, not administration, and thus is not exempt. *McKeen-Chaplin*, 862 F.3d at 854. In reaching that conclusion, the Ninth Circuit relied on a Department of Labor Opinion Letter from 2010. The Department of Labor explained, "[t]he case law and regulatory distinction between servicing the business and routine sales work requires an examination of whether an employee . . . has the primary duty of making sales." DOL Wage & Hour Div. Op. Ltr. (Mar. 24, 2010), at *4 (accessible at https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/FLSAAI2010_1.pdf). "[R]elevant factors in evaluating whether an employee has a primary duty of [] sales include whether the employee solicits customers, receives sales training, is compensated by commission, is labeled a salesman, [and] is held to a production standard." *Id.* (citing *Olivo v. GMAC Mortgage Corp.*, 374 F. Supp. 2d 545, 550 (E.D. Mich. 2004)). When employees perform work incidental to sales for the benefit of their employer, not the benefit of the customer, work should be considered sales work. *Id.*

GTZ argues Murphy's duties as a Logistics Specialist directly related to management and general business operation. (Doc. 126 at 24–25). The following facts are undisputed.[15] About 90% of Murphy's work time was spent identifying potential

---

[15] Murphy objects to GTZ description of account management duties and the support he provided his manager but only cites Murphy's declaration, which does not contradict GTZ's descriptions. (Doc. 139 at 2–3).

customers, securing shipping transactions, and managing existing accounts. (Doc. 139-2 at 13). Murphy was required to cold call hundreds of new potential customers each week. (Doc. 139-2 at 13). His account management duties included "determining what shipping options and services best met the customer's needs; negotiating quotes with shippers and carriers; handling invoicing of accessorials and carriers costs; analyzing lane data, quotes, and customer historical shipping data; reviewing RFPs, as well as drafting specialized bids for customers; building shipments for customers; dispatching shipments to the carrier for customers that wanted to ship less than full truckloads; ensuring that loads were picked up, transported and delivered on time to meet or exceed the customer's expectations and requirements; and communicating with other departments to discuss, among other things, load options, load details, issues relating to credit/claims/billing/collections, tracking updates, and lost/damaged shipments." (Doc. 126 at 3–4).

Regardless of the precise formulations offered by GTZ, by all accounts, from December 2015 to December 2016, Murphy's primary role at GTZ was sales.[16] (Docs. 139 at 17, 132-15 at 2). Forty to fifty GTZ employees were employed in the same role. (Doc. 128 at 24). All of whom reported to managers, the Director of Sales, and/or the Vice President of Sales. (Doc. 139 at 17). Murphy's base salary was $40,000, but he earned a 10%, 12%, or 15% commission on his sales. (Doc. 137 at 17). He was required to meet a cold call quota of hundreds of new potential customers each week. (Doc. 139-2 at 14). He spent 6 to 7 hours each day attempting to reach new customers. (Doc. 139-2 at 14).

GTZ attempts to avoid the conclusion that Murphy's primary role was sales by arguing Murphy's "account management role" constitutes management of GTZ's business. (Doc. 137 at 17). To support that argument, GTZ cites Murphy's deposition where he explains that once he gained a customer, he would "move into an account management

---

[16] GTZ alleges Murphy's role beginning in January or February 2017 included "a few managerial duties" and was a "Manager in Training" position. (Doc. 126 at 4). GTZ also asserts Murphy supported and assisted the manager of his department in various ways throughout 2016 and 2017. (Doc. 126 at 4). However, the evidence to support that assertion only references his role that began in January or February 2017. (Doc. 126-2 at 9). Murphy disputes these facts. Because his role and responsibilities in 2017 is irrelevant to the FLSA claim, the Court will not address the disputed facts.

role" for that customer. (Doc. 137-6 at 3).[17] But even accepting that Murphy did not spend *all* his time trying to make sales, there is no genuine dispute of material fact that Murphy's primary role was sales. Accordingly, the Court finds that Murphy's position at GTZ from December 2015 to December 2016 was not exempt under the FLSA.

### C. Overtime Hours

Murphy seeks overtime wages based on his allegation that he worked 45 to 60 hours every work week from December 2015 to December 2016. The FLSA requires employers pay employees overtime wages of one and one-half times their regular rate of pay for each hour worked more than 40 hours during a week. 29 U.S.C. § 207(a)(1).

"An employee bringing an action for unpaid overtime compensation and liquidated damages has the burden of proving that she performed work for which she was not properly compensated." *Finton v. Cleveland Indians Baseball Co.*, No. CV-19-02319-PHX-MTL, 2021 WL 661975, at *5 (D. Ariz. Feb. 19, 2021) (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87 (1946), *superseded by statute on other grounds*). "If, however, the employer fails to keep adequate records of the employee's hours, the employee's burden is lightened." *Id.* "Under *Mt. Clemens's* burden-shifting framework that applies when there are [inadequate] records, the employee must only (1) prove that he has in fact performed work for which he is owed overtime, and (2) produce sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id.* (citation and internal quotation omitted).

"[T]he Ninth Circuit . . . appear[s] to take a more relaxed approach to a plaintiff's initial burden in the *Mt. Clemens* framework." *Ader v. SimonMed Imaging*, 465 F. Supp. 3d 953, 965–66 (D. Ariz. 2020). For example, in *Brock*, the Ninth Circuit found four employee's testimony that they worked over 40 hours a week without overtime pay was neither "too unspecific" nor "too speculative" to infer damages. *Brock v. Seto*, 790 F.2d 1446, 1448–49 (9th Cir. 1986). "In *Manuel*, the court held the plaintiff's testimony that she

---

[17] The parties do not provide enough admissible evidence regarding the account management work to determine whether or not it is provided for the benefit of GTZ or the customer.

1  worked overtime between 10 and 20 times during her 30-minute lunch break and
2  sometimes after work was sufficient to send her claim to the jury, who would then 'draw
3  whatever reasonable inferences' from the employee's evidence." *Ader*, 465 F. Supp. 3d at
4  966 (quoting *Manuel v. Quest Diagnostics*, 341 F. App'x 348, 349 (9th Cir. 2009)).

5         "GTZ produced no time records of hours worked or payroll records from December
6  2015 to June 2016." (Doc. 128-1 at 65). Murphy's burden is thus lightened. In his
7  declaration, Murphy alleges he worked 45 to 60 hours every work week during his
8  employment. (Doc. 128-1 at 3). He states that he would often work from home before and
9  after working in the office. (Doc. 128-1 at 3). He also claims he would often work from
10 home on the weekends. (Doc. 128-1 at 2–3). The Court will follow the Ninth Circuit's
11 precedent that this evidence is sufficient to present to a jury, who can draw reasonable
12 inferences from Murphy's evidence. The Court will grant Murphy's motion for summary
13 judgment on this issue.

14        This matter is now ready for trial.

15        Accordingly,

16        **IT IS ORDERED** GTZ's motion for summary judgment (Doc. 126) is **DENIED**.

17        **IT IS FURTHER ORDERED** Murphy's motion for partial summary judgment
18 (Doc. 128) is **GRANTED IN PART** and **DENIED IN PART**.

19        **IT IS FURTHER ORDERED** all Motions in Limine are due **April 12, 2021**.
20 Responses are due ten days afterward.  No replies are permitted unless ordered by the
21 Court.  Prior to filing any Motion in Limine, the parties must confer and discuss the
22 contents of each planned motion.  No Motion in Limine should be filed if the other party
23 does not oppose the relief requested.

24        **IT IS FURTHER ORDERED** the Joint Proposed Pretrial Order, if not already
25 filed, is due **April 26, 2021**.

26        **IT IS FURTHER ORDERED** the parties shall review the Court's standard Juror
27 Questionnaire (available on the Court's website) and submit **NO MORE THAN FIVE**
28 **STANDARD PROPOSED QUESTIONS EACH** to be added to the standard Juror

1  Questionnaire with the Court's approval no later than **April 26, 2021**. Each proposed
2  question shall stand alone and shall not contain sub-parts.

3       **IT IS FURTHER ORDERED** the parties shall submit a Joint Statement of the
4  Case, of no more than a few short sentences for the Juror Questionnaire, no later than **April**
5  **26, 2021**.

6       **IT IS FURTHER ORDERED** the parties shall submit a second Joint Statement of
7  the Case, of no more than two short paragraphs to be read to the jury, no later than **May**
8  **10, 2021**.

9       **IT IS FURTHER ORDERED** no later than **May 10, 2021**, the parties shall file
10  and submit via email (silver_chambers@azd.uscourts.gov) in Word format proposed Jury
11  Instructions in compliance with the procedures available on the Court's website, including
12  but not limited to: 1) a *joint* set of proposed jury instructions where the parties' instructions
13  agree; 2) a separate set of instructions (one for each party) where the parties do not agree;
14  and 3) legal authority supporting all proposed instructions whether the parties agree or not.
15  Where the parties do not agree, the opposing party shall clearly state its objection to the
16  proposed instruction and the proposing party shall clearly state its response.

17       **IT IS FURTHER ORDERED** the parties will jointly file a proposed form of
18  verdict, or if the parties do not agree, they may separately file proposed forms of verdict
19  no later than **May 10, 2021**.

20       **IT IS FURTHER ORDERED** no later than **May 10, 2021**, the parties shall deliver
21  to chambers excerpts of the deposition testimony they propose to present at trial, in
22  compliance with the procedures available on the Court's website (found in Deposition
23  Designation Procedure for Judge Silver), including but not limited to: Plaintiffs
24  highlighting in yellow the portions they wish to offer and Defendants highlighting in blue
25  those portions they wish to offer. If either party objects to the proposed testimony, a
26  specific and concise objection (e.g., "Relevance, Rule 402") shall be placed in the margin
27  adjacent to the proposed testimony.

28       **IT IS FURTHER ORDERED** a final pretrial conference is set for **June 3, 2021 at**

**11:00 a.m.**, at which time the Court will review Juror Questionnaires.  The parties shall meet and confer prior to this date regarding the Juror Questionnaires and email to the Courtroom Deputy no later than noon on **June 2, 2021** a list of any jurors they agree should be stricken for cause, along with any objections to jurors they do not agree should be stricken for cause.  **The parties shall not file this list.**  The Court will rule on any disputed jurors at the final pretrial conference.

**The parties will be supplied a disk containing the questionnaires approximately one week prior to the final pretrial conference.  Counsel shall bring a copy of the questionnaires to the conference for review.  Counsel are required to return the disk to the Courtroom Deputy and destroy all copies of the questionnaires no later than the last day of trial.**

**IT IS FURTHER ORDERED** trial to a jury is set for **June 7, 2021 at 8:30 a.m.**. Estimated length of trial is 5 days.

**IT IS FURTHER ORDERED** the parties shall comply with the Exhibit Procedures found on the Court's website at www.azd.uscourts.gov / Judges' Information / Orders, Forms & Procedures for Hon. Roslyn O. Silver.

Dated this 26th day of March, 2021.

Honorable Roslyn O. Silver
Senior United States District Judge